### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| JOSE RODRIGUEZ JR., | **Civil Action No.:** 1:24-cv-00085 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| EQUIFAX INFORMATION SERVICES, LLC | |
| Defendant. | |

## COMPLAINT

Plaintiff Jose Rodriguez Jr., ("Plaintiff" or "Mr. Rodriguez") brings this action on an individual basis, against Defendant Equifax Information Services, LLC ("Defendant" or "Equifax") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq*.

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory,

1

all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse.  Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      Defendant Equifax Information Services LLC ("Equifax"), together with non-parties Experian Information Solutions, Inc., and, Trans Union LLC ("Trans Union"), are the three major credit reporting bureaus in the United States.

5.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

6.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the

personal, private, and financial information that they compile and sell about individual consumers.

7.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies."  *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

8.     Congress made the following findings when it enacted the FCRA in 1970:

> (a)   The banking system is dependent upon fair and accurate credit reporting.   Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

> (b)   An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

> (c)   Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

3

> (d)   There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

9.     Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."  15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

10.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item

as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

11.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

12.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

13.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

14.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

15.     Plaintiff brings claims against the Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

16.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, as described herein.

## PARTIES

17.     Plaintiff Jose Rodriguez Jr., ("Plaintiff" or "Mr. Rodriguez") is a natural person residing in Hollan, Michigan, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

18.     Defendant Equifax Information Services, LLC ("Defendant" or "Equifax") is a limited liability company with a principal place of business located

at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Michigan, including within this District.

19.     Defendant Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Defendant Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS
### Summary of the Fair Credit Reporting Act

22.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the

rights of consumers to fairness and accuracy in the reporting of their credit information.

23.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

24.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

25.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

8

26.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### The "Mixed File" Problem

27.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

28.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

29.     The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report."  *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

30.     "Mixed files" create a false description and representation of a consumer's credit history and result in the consumer not obtaining credit or other benefits of our economy.

31.     Defendant Equifax's procedures for matching consumer information to a consumer report often cause the mixing of one consumer with another.

32.     Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is

9

mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and a Defendant sells information pertaining to one consumer in response to the application of the other. This violates the consumer's privacy and also greatly increases their risk of identity theft.

**The "Mixed File" Problem is Known to Defendant Equifax**

33.     Mixed files are not a new phenomenon. Defendant has been on notice of the existence of mixed files.

34.     In particular, Defendant Equifax has been on notice of the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years.  *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

35.     Defendant Equifax mixes files even though every consumer has unique personal identifying information, such as a Social Security number.  That is so because its systems allow information to be included in a consumer's file even when the Social Security number reported with the information is different from the Social Security number on the consumer's file.

36.     Defendant Equifax knows that its matching procedures are causing inaccurate consumer reports, consumer disclosures, and mixed files.

37.     In the 1990's, the Federal Trade Commission ("FTC") sued Defendant Equifax  (together with non-parties Experian's predecessor TRW and Trans Union)

because of its failure to comply with the FCRA including the mixing of consumers' files.

38.     In the 1990's, the Attorneys General of numerous states sued Defendant Equifax (together with non-parties Experian's predecessor TRW and Trans Union) because of its failure to comply with the FCRA including the mixing of consumers' files.

39.     In 1991, TRW signed a Consent Order with the FTC.  To prevent the occurrence or reoccurrence of a mixed file, TRW agreed to use, for matching and identification purposes, a consumer's full identifying information, defined as full first and last name, full street address, zip code, birth year, any generational designation and social security number.

40.     In 1992, non-party Trans Union signed a Consent Order with the Attorneys General of 17 states.   Non-Party Trans Union agreed that it would maintain reasonable procedures to prevent the occurrence or reoccurrence of mixed files. For example, procedures during the reinvestigation process include, assigning mixed file cases to Senior Investigators who, as appropriate, must pull all files related to the consumer, fully verify disputed information, make any changes, deletions or additions to correct the file and resolve the dispute, and prepare a summary of the problem to be filed with another department for corrective action.

11

41.     In 1992, Defendant Equifax signed an Agreement of Assurances with the State Attorneys General and agreed to take specific steps to prevent the occurrence of mixed files and to adopt procedures designed specifically to reinvestigate consumer disputes resulting from mixed files.

42.     In 1995, Defendant Equifax signed a Consent Order with the FTC. Defendant Equifax agreed it would follow reasonable procedures to assure the maximum possible accuracy of the information on a consumer's file including, but not limited to, procedures to detect logical errors prior to reporting information on a consumer's file, procedures to prevent mixing as a result of data entry by third parties when the third party requests a consumer's report, and procedures during a reinvestigation specifically designed to resolve consumer disputes related to a mixed file.

43.     To prevent the occurrence of a mixed file, Defendant Equifax together with non-parties Experian and Trans Union entered into agreements not to place information in a consumer's file (other than certain public record information) unless it has identified such information by at least two of the following identifiers: (i) the Consumer's name; (ii) the Consumer's Social Security number; (iii) the Consumer's date of birth, or (iv) the Consumer's account number with a Subscriber or a similar identifier unique to the Consumer.

44.    Defendant Equifax and non-parties Experian and Trans Union continue to repeatedly mix consumers' files despite agreements with the FTC and State Attorneys General and hundreds of lawsuits filed against them by consumers whose files have been mixed.

45.    When those lawsuits have gone to trial, juries have found that Defendant Equifax and non-parties Experian and Trans Union, willfully violated the accuracy and reinvestigation requirements of the FCRA - §§ 1681e(b) and 1681i – and awarded punitive damages as high as $18 million.  Yet the "mixed file" problem continues.

46.    For example, in 2015, the New York Attorney General filed charges and settled claims with Defendant Equifax and non-parties Experian and Trans Union over mixed files.[1]  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

47.    Defendant Equifax's matching logic mixed two consumers' files when only seven out of the nine digits of the two consumers' Social Security numbers

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

matched.  *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1224 (D.N.M. 2006).

48.    In 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.   The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.   Despite the verdict, Defendant Equifax continues to mix consumers' credit files with other consumers' credit files.

49.    In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant Equifax continues to mix consumers' credit files with other consumers' credit files.

50.    In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to

14

unmix them despite Ms. Miller' numerous disputes.  Despite the verdict, Defendant

Equifax continues to mix consumers' credit files with other consumers' credit files.

51.     More recently, a jury assessed a $60 million dollar verdict against Trans

Union for mixing innocent persons as terrorists and drug dealers by matching

consumers with the Office of Foreign Asset Control's "terrorist alert" list based on

first and last name alone.  *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC,

2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part,*

*rev'd in part sub nom.  Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020).

Despite the verdict, Defendant Equifax continues to mix consumers' credit files with

other consumers' credit files.

52.     Defendant has been sued thousands of times wherein an allegation was

made that Defendant violated the FCRA.

53.     FCRA lawsuits have resulted in multi-million-dollar verdicts for

consumers who fall victim to a mixed credit file.

54.     "Evidence that a defendant has repeatedly engaged in prohibited

conduct while knowing or suspecting that it was unlawful would provide relevant

support for an argument that strong evidence is required to cure the defendant's

disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting

that whether "other consumers have lodged complaints similar to Dalton's against

CAI" is relevant to willfulness under the FCRA).   Moreover, repeated

noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

55.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

56.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies to review procedures when a mixed file occurs.

57.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

58.    Plaintiff's claims arise out of the Defendant's blatantly inaccurate credit reporting, wherein Defendant published in consumer reports about Plaintiff the information of another consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

**Plaintiff Submits a Credit Application for a Mortgage with Rocket Mortgage**

59.     In or around October of 2023, Plaintiff learned that his landlord intends to sell the rental home that he along with his wife and children currently occupy.

60.     Looking to purchase this home from his landlord, Plaintiff applied for a mortgage with Rocket Mortgage LLC, in or around October 2023.

61.     Specifically, Plaintiff completed and submitted a credit application for a mortgage with Rocket Mortgage LLC, to purchase the rental home he currently occupies.

62.     For Rocket Mortgage to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit files. Plaintiff provided Rocket Mortgage with his personal identification information, including his Social Security number, and authorized it to obtain copies of his credit files.

63.     On October 31, 2023, Equifax sold a consumer report about Plaintiff to Rocket Mortgage in response to Plaintiff's credit application for a mortgage.

**Rocket Mortgage Denies Plaintiff's Credit Application For A Mortgage**

64.      On October 31, 2023, Rocket Mortgage received and reviewed Equifax's consumer report about Plaintiff.

65.     On October 31, 2023, Rocket Mortgage denied Plaintiff's credit application in reliance on information contained in the Equifax consumer report about Plaintiff.

66.     Plaintiff's credit application was denied due to a debt-to-income ("DTI") ratio that was too high, indicating excessive debts on Plaintiff's consumer file.

67.     The DTI was calculated based upon the contents of the Equifax's consumer report published to Rocket Mortgage about Plaintiff.

68.     Plaintiff was perplexed at the credit denial.  He didn't believe he had that much debt to create an issue with the DTI

69.     Defendant Equifax inaccurately published, in the consumer report to Rocket Mortgage, several pieces of information including personal identifiers, accounts, debts, and obligations, which did not belong to Plaintiff, thereby inaccurately increasing Plaintiff's DTI, worsening Plaintiff's credit picture,and causing him to be denied for the home loan.

70.     Defendant Equifax inaccurately published in the consumer report to Rocket Mortgage several pieces of information, including personal identifiers, accounts, debts, and obligations, which belonged to another consumer.

71.     Specifically, the contents reported belonged to another consumer with the distinctive name of Jose Luis Rodriguez Lopez.

72.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

18

**Plaintiff's Mixed Credit File**

73.     Shocked, worried, and confused, Plaintiff requested a copy of his consumer reports from Defendant.

74.     Plaintiff was able to secure a copy of his consumer report produced by Equifax on or about November 8, 2023.

75.     Upon reviewing the contents of consumer reports, Plaintiff was shocked at the appearance of several pieces of information that did not belong to Plaintiff at all.

76.     Defendant Equifax mixed Plaintiff's file with another consumer's credit information despite the fact that Defendant Equifax reported distinctive names, social security number, and date of birth belonging to another consumer named Jose Luis Rodriguez Lopez.

77.     Defendant Equifax falsely attributed a name, addresses, a social security number, date of birth, and no less than eleven (11) accounts to Plaintiff:

78.     Specifically, Defendant was reporting the following accounts which did not belong to Plaintiff:

<div style="border:1px solid #ccc; padding:4px; font-size:small;">Commented [MCR1]: Further down in this template, the recitation of the further entities that violated the FCRA inclues this specific language of the mistaken notations. I incorporated those sections here, although they were not present for the credit bureau in this template.</div>

    (a)     Advantage FCU;

    (b)     THD/CBNA;

    (c)     Sears/CBNA;

    (d)     Syncb/American Eagle;

19

   (e)  Family First of NY Federal Credit Union (FCU);

   (f)  Family First of NY Federal Credit Union (now closed);

   (g)  Snap-On Credit;

   (h)  Advantage Federal Credit Union;

   (i)  Advantage Federal Credit Union (now closed);

   (j)  Advantage Federal Credit Union (now closed);

   (k)  ESL Federal Credit Union;

79. Defendant reported the following date of birth which did not belong to Plaintiff:

   (a)  November 6, 1978.

80. Defendant reported the following addresses which did not belong to Plaintiff, as the Plaintiff only ever resided in Michigan:

   (a)  A3 Calle 1 Urb El Torito Cayey, PR;

   (b)  36 Marble Drive Rochester, NY;

   (c)  380 Parkland Ave Seymour, IN;

   (d)  1372 Ridgeway Ave APT A Rochester, NY;

81. Defendant further reported the following name which did not belong to Plaintiff, as Plaintiff has no middle name:

   (a)  Jose Luis Rodriguez/Lopez.

82.    By reporting the aforementioned credit accounts and other personal information in the credit files presumably about Plaintiff, despite the fact that the accounts and information did not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

83.    As a result of the "mixed file," Defendant made it practically impossible for Plaintiff to obtain credit.

## DAMAGES

84.    Due to Defendant's inaccurate reporting, Plaintiff was unable to secure a joint mortgage with his wife to purchase the family home they had been living in from the landlord, because his mortgage credit application was denied.

85.    Due to Defendant's inaccurate reporting, Plaintiff and his wife could not qualify for loan approval to purchase their current home from the landlord who was willing to sell to them, prior to the denial of credit for Plaintiff.  Consequently, Plaintiff and his wife were denied their home of choice and area of choice and have had to seek undesirable options for housing, as they have to be out of the current rental, they were going to purchase with the Rocket Money loan, on or before January 31, 2024.

86.     Plaintiff and his wife had to resort to seeking a rental, as the preapproval they were able to obtain on his wife's credit alone was not sufficient for them to be able to live in their current hometown or any of the towns they were originally planning to live in.

87.     Instead, Plaintiff and his wife have had to look into rentals which are also not as suitable as purchasing their current home from their landlord, as rentals are extremely high in the market right now, and the family has pets.  Many landlords in the desired area do not accept pets or require high deposits.

88.     Plaintiff was only able to obtain a rental to move by January 31, 2024, in a city in Michigan with a higher crime rate, and an hour commute from his job, causing him to have to leave his family for extended periods to commute to his third shift work.  Prior to these events, the family's rental home that they had attempted to purchase from the landlord was only a 5–10 minute drive from his office.

89.     At all times pertinent hereto, Defendant was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendant herein.

90.     At all times pertinent hereto, Defendant's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless,

grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

91. Defendant is aware of the shortcomings of its procedures and intentionally chooses not to comply with the FCRA to lower its costs. Accordingly, Defendant's violations of the FCRA are willful.

92. As a result of Defendant's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

### CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (Claim for Relief Against Defendant Equifax)

93. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

94. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***the maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

95.    On at least one occasion, Defendant Equifax prepared patently false consumer reports concerning Plaintiff.

96.    Defendant Equifax mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

97.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

98.    As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of a home loan to purchase their rental house, loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally

identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

99.     Defendant Equifax's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

100.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

<div align="center">**PRAYER FOR RELIEF**</div>

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.  Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 29th day of January 2024

**CONSUMER ATTORNEYS**
By: */s/ Beth K. Findsen*
Beth K. Findsen, AZ No. 023205
CONSUMER ATTORNEYS
8245 N. 85th Way,
Scottsdale, AZ 85258
T: 602-807-6676
F: 718-715-1750
E: bfindsen@consumerattorneys.com

*Attorneys for Plaintiff,*
*Jose Rodriguez Jr.*